UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. 18-cr-301  (NEB/DTS) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| ALONZO PIERRE MINGO, | |
| Defendant. | |

Emily Polachek & Surya Saxena, U.S. Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota, 55415, for the Government.

Michael C. Hager, Esq., 310 Fourth Avenue South, Suite 1150, Minneapolis, Minnesota 55415, for Defendant.

## INTRODUCTION

During an investigatory stop at a St. Paul gas station, police officers found a gun in Defendant Alonzo Pierre Mingo's coat. The Government subsequently charged Mingo with one count of being a felon in possession of a firearm. Mingo seeks to suppress the gun as the fruit of an unlawful search. Because the Court is satisfied both that the police's initial seizure was a valid *Terry* stop, and that the subsequent search of Mingo's person was incident to a lawful arrest, Mingo's motion to suppress should be denied.

## FINDINGS OF FACT

### I.   The Stop and the Gun

Shortly after 9 p.m. on October 26, 2018, the St. Paul Police Department received a 911 call. The caller stated he saw two men with guns in the alley behind the BP gas station on Lexington Parkway. Hr'g Tr. 7-8, Dkt. No. 50. The caller also said there was a

gray Buick with tinted windows in the alley, although the association between the men and the car was not clear. *Id.* at 8, 24. Saint Paul police had been monitoring that particular gas station in the days leading up to the call because of an increase in drug and weapons activity around it. *Id.* at 10.

A dispatcher relayed the call information to three St. Paul Police Department officers: Kou Yang, John Cajacob, and Evan Kowalski. *Id.* at 8. The officers arrived at the gas station shortly after receiving the call. *Id.* at 24-25. Officers Cajacob and Kowalski, who were in a marked police car, investigated the area behind the gas station. Officer Yang, who was in uniform but in an unmarked car, set up surveillance in front of the gas station on Central Avenue, which bisects Lexington Parkway. *Id.* at 8-9; Def. Ex. 2. Officers Cajacob and Kowalski did not find either of the two men described by the caller or any weapons during their investigation in the alley, although they did encounter a man dressed in black. Hr'g Tr. 25-27.

When Officer Yang took up his position to observe the gas station, he saw a gray Buick LaCrosse with tinted windows already at a gas pump on the north end of the row of pumps, next to a black Nissan. *Id.* at 9. Two men were standing behind the vehicles. *Id.* at 9-10. Although it was nighttime and raining, lights in the canopy above the pumps illuminated the front of the gas station. Gov't Exs. 1, 2, 3; Def. Ex. 1. While the other officers were investigating the alley, Officer Yang watched people drive up in cars and interact with the men. Hr'g Tr. 9-10. Because the Buick matched the vehicle described by the 911 caller, and because he saw others pulling up to interact with the men, Officer Yang decided to continue his surveillance after the search of the alley ended. He asked Officers Cajacob and Kowalski to stay in the area. *Id.*

Officer Yang watched the gas station for approximately two hours. *Id.* at 11. Using binoculars, he was able to read the license plate of the Nissan and discovered the car was registered to Tyrese Reed. *Id.* Yang recognized Reed from prior investigations for both drugs and weapons and identified him as one of the two men standing behind the parked cars.[1] *Id.* at 11, 14. Although Officer Yang could not read the Buick's license plate from a distance, officers later identified its owner, the other man standing with Reed, as Mingo. *Id.* at 11, 31. Over the approximately two hours, Officer Yang watched people drive or walk up to Mingo and Reed. *Id.* at 12. From a distance, it appeared that Reed or Mingo would shake hands with these people. *Id.* at 12, 33. Officer Yang testified that, based upon his experience, the interactions were consistent with hand-to-hand drug exchanges. *Id.* at 12, 33-34. During the entire time he was observing them, Officer Yang did not see either Mingo or Reed pump gas or go into the station. *Id.* at 12.

Eventually, Officer Yang decided to approach the two men. *Id.* at 13. He informed his supervisor, who sent several other officers for support. *Id.* at 13. Officer Yang also coordinated with Officers Kowalski and Cajacob to approach first in their marked squad car. *Id.* at 13-14. Officer Yang informed the others that Reed was one of the two men and that he had previous interactions with law enforcement. *Id.*

Officers Kowalski and Cajacob reached the two men first, followed a few seconds later by Officer Yang. Gov't Ex. 2 (Kowalski Bodycam) at 00:06; Gov't Ex. 1 (Yang Bodycam) at 00:05. Both Reed and Mingo initially talked to the officers while standing

---

[1] Officer Yang testified that, although he could read the Nissan's license plate, he did not notice a hole in that car's rear window until he and other officers approached. Hr'g Tr. 31-32.

behind the Nissan. Gov't Ex. 2 at 00:14. As Officer Cajacob patted down Reed,[2] Mingo began walking around the driver's side of the Nissan toward the front of the car. Hr'g Tr. 15; Gov't Ex. 1 at 00:20. As he did so, other officers approached the front of the two cars from the direction of the gas station. Gov't Ex. 3 (Dean Bodycam) at 00:20; Hr'g Tr. 15. Officer Kowalski, who was looking into the Buick, asked Mingo to confirm whose vehicle it was. Gov't Ex. 2 at 00:30. Mingo gestured to the Buick and stated that it was his car. Gov't Ex. 3 at 00:22. Mingo circled around the front of the Nissan toward the driver's side door of the Buick. As Mingo reached for the driver's door handle, Officer Kowalski told him to "hold on" and made a gesture for him to stop. Gov't Ex. 3 at 00:35.

As Mingo stood between the two cars with an officer on either side of him, Officer Dean directed him to "come here for a second" and asked him if he had anything on him. Gov't Ex. 2 at 00:50. As Mingo began to move past Officer Kowalski, Officer Dean walked up behind him. *Id.* at 01:00. Officer Dean grabbed at the bottom of Mingo's coat, stating that he wanted to see if Mingo had anything on him. *Id.*; Gov't Ex. 3 at 00:45. Officer Dean then took Mingo's left arm and began to pat down the outside of the coat. Gov't Ex. 3 at 00:50. At that point, Mingo actively broke free from Officer Dean's hold, and stumbled forward and away from Officer Dean. *Id.*; Gov't Ex. 1 at 00:50.

The next few seconds of the encounter were chaotic. One officer attempted to grab Mingo as he stumbled forward from Officer Dean, but Mingo pushed him away and started toward the street. Gov't Ex. 2 at 01:05. Officer Yang also tried to grab Mingo. As Mingo broke away from Officer Yang, he fell to the ground. Gov't Ex. 1 at 00:55 An officer

---

[2] Although Officer Yang could not remember which officer was patting down Reed when he approached, footage from Officer Kowalski's bodycam shows that Officer Cajacob conducted Reed's pat down.

4

ordered Mingo to stop, but Mingo attempted to get back up. Gov't Ex. 2 at 01:10. At that point, Officer Yang pushed Mingo while another officer fired his taser. This drove Mingo to the ground. *Id.*; Hr'g Tr. 16.

Officers rolled Mingo over and placed him in handcuffs. Gov't Ex. 2 at 01:20. Officer Yang testified that, at that point, he considered Mingo under arrest. Hr'g Tr. 16. Once Mingo was in handcuffs, Officer Kowalski searched his pockets and unzipped his jacket. Gov't Ex. 2 at 02:50. As they stood him up, another officer found a handgun in Mingo's right jacket pocket. *Id.* at 03:50.

## II.     Reopened Evidentiary Hearing

The first evidentiary hearing in this matter occurred on April 23, 2019. Minute Entry, Apr. 23, 2019, Dkt. No. 45. At that time, Mingo was represented by the Office of the Federal Defender. After receiving post-hearing briefing, the Court issued a Report and Recommendation denying Mingo's motion to suppress. Before objections were due, Mingo filed a pro se motion requesting new counsel. *See* Dkt. No. 59-61. The Court granted Mingo's motion and appointed Mr. Hager of the Criminal Justice Act Panel to represent Mingo. Order, July 1, 2019, Dkt. No. 64. The Court also granted Mingo additional time to file any objects to the R&R. Order, July 3, 2019, Dkt. No. 66.

Mingo, through his new counsel, claimed he had evidence showing he was not at the gas station the entire time Officer Yang placed him there, and sought to reopen the hearing to supplement the record. Mot. to Reopen Evidentiary Hr'g on Pretrial Mots., Dkt. No. 67. The District Court granted the request "for the limited purpose of receiving evidence of phone records and video recordings indicating Defendant's location before his arrest[.]" Order, July 25, 2019, Dkt. No. 69. Because the District Court reopened the

evidentiary hearing before any formal objections were filed, this Court vacated the prior R&R. Order, July 30, 2019, Dkt. No. 70.

After a continuance to give Mingo time to subpoena and analyze the phone records, the Court held the limited suppression hearing on December 12, 2019. Mingo submitted the phone data and an affidavit from the forensic examiner who analyzed the data. Def. Exs. 3-4. The Court also gave Mingo until January 3, 2019, to submit video from the security camera outside the gas station. Mingo provided both the Court and Government a copy of the video, which the Court admits as Defendant's Exhibit 5, by that deadline. To the extent it is relevant, this supplemental evidence is discussed in the Court's analysis.

## CONCLUSIONS OF LAW

Mingo seeks to suppress any evidence officers seized from him during his arrest, arguing police lacked the reasonable suspicion necessary to conduct an investigatory stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). The Government does not contend that any part of Mingo's encounter with the police officers was voluntary, thus acknowledging that both the initial stop and subsequent search of Mingo's person implicate the Fourth Amendment's protection "against unreasonable searches and seizures." U.S. Const. amend. IV. Both the stop and the search independently implicate the Fourth Amendment. *See, e.g.*, *United States v. Horton*, 611 F.3d 936, 940-41 (8th Cir. 2010) (analyzing separately the officer's stop and subsequent frisk of the defendant).

**I.   The Seizure**

Although police may generally seize a person only with a warrant or probable cause, they may "conduct a brief investigative stop when they have reasonable,

6

articulable suspicion that a person is committing or is about to commit a crime." *Horton*, 611 F.3d at 940. Officers have such reasonable suspicion when, based upon the totality of the circumstances, they can "identify 'specific, articulable facts' that justify the stop." *United States v. Trogdon*, 789 F.3d 907, 910 (8th Cir. 2015) (quoting *Horton*, 611 F.3d at 940). This requires more than a "hunch," but officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotations omitted).

The Saint Paul police officers involved here had reasonable suspicion to briefly seize Mingo for investigative purposes. In the days before the stop, officers had been informed of increased criminal activity at the gas station. Although never enough alone, knowledge of a high crime area is "among the relevant contextual considerations in a *Terry* analysis." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Officer Yang could reasonably interpret what he saw during his surveillance with this information in mind. Similarly, when the officers had initially arrived at the gas station, they had done so in response to a 911 call that had described two individuals with guns near a grey Buick, whom they did not find while investigating the alley. Although the 911 caller had not unequivocally connected the car in the alley with the armed individuals, Officer Yang could reasonably infer that the gray Buick parked at a gas pump may be related to the 911 call.

More importantly, Officer Yang's observation during his surveillance were alone sufficient to create reasonable suspicion. When Officer Yang arrived at the gas station, two cars were already pulled up at gas pumps, and two men stood near them. By running

7

the plate number of the Nissan, Officer Yang was able to identify its owner as one of the men standing near it, Reed, who was suspected in other criminal activity. Officer Yang could reasonably assume the other man, Mingo, was the driver of the Buick. Although Mingo was not identified until later, the interactions Yang saw between Mingo and Reed created a reasonable inference that Reed and Mingo were associated. As such, Reed's conduct is relevant to a finding of reasonable suspicion to stop Mingo. *Trogdon*, 789 F.3d at 912; *see also United States v. Menard*, 95 F.3d 9, 11-12 (8th Cir. 1996) (finding *Ybarra v. Illinois*, 444 U.S. 85 (1979), inapposite for a totality-of-the-circumstances analysis where the individuals "did not just happen to be together in a public place").

Moreover, even though the two cars sat at the gas pumps for around two hours, Officer Yang never saw any conduct consistent with the regular use of a gas station. *See United States v. Carr*, 2018 WL 3105928, at *9 (E.D. Wis. June 25, 2018) (noting the defendant's extended presence at a gas station "without pumping gas or going into the station" as one fact constituting sufficient reasonable suspicion for an investigative stop). But Officer Yang did see a series of people approach the two men and apparently shake their hands. He testified that he had seen hand-to-hand drug transactions before, and that these handshakes were consistent with such an exchange. Taken together, these observations gave rise to an objective, reasonable suspicion warranting a brief investigative stop.[3]

---

[3] Contrary to the Government's proposed analysis, the Court's finding of reasonable suspicion does not incorporate the officers' observations of Mingo's allegedly evasive behavior during the investigative stop. The investigative stop exception to the Fourth Amendment's probable cause requirement does not go so far as to allow post hoc rationalization—the police must have a reasonable, articulable suspicion at the time they initiate the stop. *Terry v. Ohio*, 392 U.S. 1, 27-28 (1968). Indeed, three of the cases the Government cites involve defendants who acted evasively upon seeing police, but before

Mingo identifies several weaknesses of the individual facts comprising the police's reasonable suspicion. He notes that the Buick's connection to the activity reported in the 911 call is tenuous at best, that the broken rear window of Reed's Nissan reasonably explains Reed and Mingo's extended stay at the gas station, and that what Officer Yang called hand-to-hand drug exchanges were simply handshakes. Perhaps he is right about each of these facts in isolation, but the Supreme Court has rebuffed such a "divide-and-conquer analysis." *Arvizu*, 534 U.S. at 274. Even weakened by isolated attacks, Officer Yang's observations, taken in their totality, created reasonable suspicion. *See United States v. Hoosman*, 62 F.3d 1080, 1081-82 (8th Cir. 1995) (holding that factors each individually "consistent with innocent activity" may yet create a reasonable suspicion of criminal activity when viewed together).

Mingo also argues that Officer Yang's testimony, the only evidence the Government offered to support reasonable suspicion, is not credible. The Court disagrees. Mingo points out that Officer Yang did not memorialize many details of his surveillance, making no rough notes and omitting seemingly important observations in his subsequent incident report. Although not best practices, such behavior does not, by itself, cast significant doubt on Officer Yang's testimony. Nor does his inability to recall whether it was raining that night or where specifically the Buick was positioned at the gas pumps.

---

the police had actually stopped them. *Trogdon*, 789 F.3d at 912 (group walked "briskly" away from approaching police car); *Horton*, 611 F.3d at 940 (noting that "*unprovoked* flight at the sight of an officer can contribute to reasonable, articulable suspicion") (emphasis added); *United States v. Cornelius*, 391 F.3d 965, 967 (8th Cir. 2004) (defendant "plac[ed] his hands in his front coat pocket and chang[ed] direction upon seeing the police car"). In the fourth case, the defendant was voluntarily talking to police and then broke off the discussion when asked about gunshots, only one of several facts noted as supporting reasonable suspicion. *United States v. Brown*, 51 F.3d 131, 132-33 (8th Cir. 1995).

9

Further, the supplemental evidence Mingo submitted does not contradict or meaningfully undermine Officer Yang's testimony that he observed Mingo and Reed hanging around the pumps for nearly two hours. Records provided by Mingo's cellphone service carrier indicate he made ten phone calls during the subpoenaed time period of 9 p.m. to midnight on October 26, 2018. Def.'s Ex. 3 (Aff. of John J. Carney) ¶ 3. Each of the six calls that had cell site location records used the same cell tower located at 393 North Dunlap Street in St. Paul, which is near the BP gas station. *Id.* at ¶¶ 3-4. These calls occurred between 10:02 p.m. and 11:07 p.m. *Id.* Although the records do not put Mingo at the gas station specifically, they do not place him elsewhere during the time Officer Yang testified to observing him. Similarly, the gas station security footage offered into evidence begins after Mingo is already at the gas station, barely ten minutes before officers moved in to seize him. Def. Ex. 5 (Security Video 0:00:00 – 0:09:00). The footage does not bear on whether Mingo was present for the entire time Officer Yang claims to have observed him.

Finally, although the fact that no drugs were apparently recovered after the incident raises doubts about whether Reed and Mingo were in fact making hand-to-hand transactions, the relevant analysis for this Court is whether an objectively reasonable police officer viewing what Yang viewed would reasonably suspect drug dealing. *See Ornelas v. United States*, 517 U.S. 690, 696-97 (1996) ("The principal components of a determination of reasonable suspicion . . . will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed form the standpoint of an objectively reasonable police officer, amount to reasonable suspicion . . . ."). A mistaken belief, if reasonable, may still justify an investigative stop.

*Trogdon*, 789 F.3d at 913. Mingo does not appear to challenge Officer Yang's testimony that people approached Reed and Mingo, or that a series of handshake-like events occurred. Whether a reasonable police officer would have viewed what Officer Yang testified to seeing as a hand-to-hand transaction is a separate question from Officer Yang's credibility, even if he relayed his observations in a conclusory manner. So, the fact that the police did not ultimately find drugs does not meaningfully undermine the credibility of Officer Yang's testimony. Finally, Officer Yang's testimony that he intended to stop the Buick after it left the gas station speaks only to his initial suspicions that it was connected to the 911 call regarding the alley, and suggests little about the veracity of his subsequent observations. Crediting Officer Yang's testimony, he had reasonable, articulable suspicion to approach Reed and Mingo for an investigative stop.

## II.   The Search

Mingo does not directly challenge the search itself, arguing only that his initial seizure was invalid and thus anything the police subsequently found must be suppressed. Even if Mingo were correct about the impropriety of the initial seizure, the handgun would still not be suppressed. Although the investigative stop is colloquialized as a "stop-and-frisk," an officer who has reasonable suspicion of criminal activity warranting a person's brief seizure may not conduct a protective frisk for weapons unless that officer also has a "reasonable, articulable suspicion that the person is armed and dangerous." *United States v. Gilliam*, 520 F.3d 844, 847-48 (8th Cir. 2008) (citing *Terry*, 392 U.S. at 30). Even then, the search must be limited to "the least intrusive means reasonably necessary" to

11

protect the officer from hidden weapons. *Id.* at 848.[4] But whether or not the search was a valid extension of the initial *Terry* stop is irrelevant, as "a defendant's response to even an invalid . . . *Terry* stop may constitute independent grounds for arrest." *United States v. Dawdy*, 46 F.3d 1427, 1431 (8th Cir. 1995).

Once Mingo broke away from Officer Dean and attempted to flee, the officers had probable cause to arrest him under Minnesota law. *See* Minn. Stat. § 609.487, subd. 6 ("Whoever, for the purpose of avoiding arrest, detention, or investigation . . . attempts to evade or elude a peace officer, who is acting in the lawful discharge of an official duty, by means of running . . . is guilty of a misdemeanor."); *United States v. Gant*, Crim. No. 12-61 (ADM/TNL), 2012 WL 2060637, at *4 (D. Minn. June 7, 2012) (finding that police had probable cause to arrest a fleeing defendant for a misdemeanor, even if the initial traffic stop lacked probable cause). By tasing Mingo and handcuffing him as he lay on the ground, the officers clearly arrested him. Upon that arrest, officers could thoroughly search Mingo's person. *Arizona v. Gant*, 556 U.S. 332, 339 (2009) (stating the purpose of a search incident to arrest is both to remove weapons from the arrestee and to prevent the concealment or destruction of evidence). Since police discovered the handgun after they had independent probable cause to arrest Mingo and had done so, suppression of the gun would not be necessary, irrespective of the constitutionality of the initial stop.

---

[4] It is doubtful that the search that produced the handgun would withstand a *Terry* frisk analysis, as Officer Kowalski's bodycam footage shows a fairly thorough search that included unzipping Mingo's jacket and reaching inside various pockets.

12

## RECOMMENDATION

For the reasons articulated above, the Court RECOMMENDS THAT Defendant's Pretrial Motion to Suppress Fruits of the Unlawful Arrest and Search and Seizure [Docket No. 32] be DENIED.

Dated: January 21, 2020

s/David T. Schultz<br>
DAVID T. SCHULTZ<br>
United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).